## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **PAMELA MCCULLERS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  1:24-cv-01496-RDP** |
| | } | |
| **KOCH FOODS OF ALABAMA, LLC, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on the Motion to Dismiss Plaintiff's First Amended Complaint filed by Defendants Koch Foods of Alabama, LLC; Koch Foods of Ashland LLC; and Koch Foods, Inc. (collectively, "Koch Foods"). (Doc. # 31). The Motion has been fully briefed. (Docs. # 31, 34, 37). After careful consideration, the court concludes that Koch Foods's Motion (Doc. # 31) is due to be granted in part.

## I.    Background

Plaintiff Pamella McCullers ("Plaintiff") has advanced a variety of claims related to her employment with Koch Foods. (Doc. # 29). The claims include, but are not limited to, sex discrimination, hostile work environment, and negligence. (*Id.*). The relevant allegations of Plaintiff's Amended Complaint are summarized below.

Plaintiff is a female who was hired by Koch Foods on August 12, 2013 as a licensed practical nurse at Koch Foods's Ashland, Alabama location. (*Id.* ¶ 6).

In February 2018, Koch Foods employee Cenetta Towns told Plaintiff that Koch Foods was stealing her (Towns's) time. (*Id.* ¶ 7). In April 2018, Towns reported a foot injury to Plaintiff in the nurse's office. (*Id.*). After Towns reported this injury to her, Plaintiff took Towns to the

emergency department, where a physician instructed Towns to return to work. (*Id.*). Throughout April 2018, Towns continued to report to the nurse's office with complaints about her foot and "with growing animosity about the injury and return to work forms." (*Id.* ¶ 8).

On May 29, 2018, Towns poked Plaintiff in the left eye with her fingernail and cursed at Plaintiff. (*Id.*). Plaintiff reported the injury to Koch Foods, but despite her request, the Safety Manager refused to add the incident to the accident report list. (*Id.*). According to Plaintiff, the incident was not reported to the Occupational Safety and Health Administration ("OSHA"), and Plaintiff was required to pay for her own medical bills from the incident. (*Id.*). Plaintiff also alleges that "at one point," Towns "called Koch Foods and threatened to blow up the plant, specifically referencing a desire to kill 'the fat white nurse.'" (*Id.*). A human resources ("HR") employee allegedly recorded this phone call. (*Id.*). Plaintiff claims that "Koch Foods took no action to protect Plaintiff or other employees from these threats." (*Id.*).

In April 2019, Koch Foods brought in Michael Burton as a new hire. (*Id.* ¶ 9). Plaintiff alleges that Koch Foods had previously terminated Burton for throwing rocks at Plaintiff and another employee in the parking lot and stating that he was going to kill Plaintiff. (*Id.*). Plaintiff further alleges that Burton was supposed to be on Koch Foods's no hire list. (*Id.*).

In April 2020, after a Koch Foods employee reported to Plaintiff that a household member had tested positive for Covid-19, Plaintiff sent the employee home. (*Id.* ¶ 10). The following day, that same employee brought other employees to work. (*Id.*). According to Plaintiff, she followed Koch Foods's policies and tested the other employees' temperatures and because one of the employees had a fever, Plaintiff sent both employees home. (*Id.*). After this, Plaintiff sent an email to the Safety Manager with concerns about HIPAA violations related to the company's Covid-19 policies. (*Id.*). Plaintiff alleges that thereafter she was reported to the nursing board for following

the company's Covid-19 policies and was informed by the Koch Foods HR Manager that she would be responsible for paying for her own attorneys to defend her nursing license. (*Id.*).

Plaintiff's Complaint also alleges that "[o]n August 24, 2021, a Koch Foods superintendent pinned Plaintiff in her chair, yelled at her, cussed at her, spit on her, stuck his finger in her face and threatened to knock her head off." (*Id.* ¶ 11). Plaintiff reported the incident to her acting supervisor and the night shift manager, but she never received any information back from HR or her supervisor about the matter. (*Id.*). According to Plaintiff, she only received a "halfhearted apology from the superintendent with a statement that HR said they must get along." (*Id.*).

On September 14, 2021, Plaintiff became aware that the former employee who had reported Plaintiff to the nursing board was being rehired. (*Id.* ¶ 12). Plaintiff sent an email to the Safety Manager, which included a reminder that the employee was supposed to be on the no hire list. (*Id.*) The Safety Manager responded that the employee would be going through orientation. (*Id.*). According to Plaintiff, she "was required to go through [the] orientation process with the employee despite the employee's history with Plaintiff and the threat to Plaintiff's nursing license." (*Id.*).

In December 2021, Plaintiff was informed that nurses would be required to take a thirty-minute lunch break. (*Id.* ¶ 13). Plaintiff responded with her concerns about her inability to take a full thirty-minute lunch break because she was the only nurse on the night shift. (*Id.*). Plaintiff also informed supervisors of her concern that the lunch-break requirement violated her employment contract. (*Id.*). According to Plaintiff, other nurses were not required to take lunch breaks. (*Id.*).

In May 2022, Koch Foods attempted to re-hire Towns, the employee who had previously poked Plaintiff in the eye. (*Id.* ¶ 14). Plaintiff reminded her supervisors and HR that Towns was supposed to be on the no hire list. (*Id.*). Nevertheless, Towns "was rehired three times although she was supposed to be on the no hire list due to safety concerns." (*Id.*). Plaintiff alleges that during

her employment with Koch Foods, Towns assaulted Plaintiff and another employee in two separate incidents and that Koch Foods did nothing to protect them from these assaults. (*Id.*).

In August 2022, Plaintiff treated a patient who suffered a scratched cornea caused by broken plexiglass. (*Id.* ¶ 15). Around this time, the eye wash station was not operative, which made it difficult for her to properly treat the patient. (*Id.*). Plaintiff also reported the following concerns: there was not a sanitary spot to clean cuts; the van keys were missing, which required her to take patients to the hospital in her own car; there was a lack of privacy for patients in the nurse's office; and because of the layout of the nurse's office, nurses were unable to get out if there was a hostile employee. (*Id.*). Plaintiff made requests to move the printer in the nurse's office so she could get away from hostile employees quickly and to have urine specimen cups hung near the sink to prevent nurses from turning their backs to employees when retrieving the cups. (*Id.*). Plaintiff alleges that her supervisors refused to approve these requests "because one nurse was short and needed the printer to be lower and they had just remodeled the office and did not want to hang anything on the walls." (*Id.*).

On May 8, 2023, Plaintiff emailed her supervisor and HR and stated that she had a "call-in," which she alleges was supposed to be paid at a minimum of four hours, but she was only given three hours for it. (*Id.* ¶ 16). Plaintiff's supervisor responded that because Plaintiff was using her vacation time during the call-in, she would only be paid for the time she was actually at the office. (*Id.*). According to Plaintiff, there were multiple incidents throughout Plaintiff's employment with Koch Foods where she was not paid in full for her call-ins. (*Id.*).

On May 8, 2023, Plaintiff alleges that she was sexually assaulted by a Koch Foods employee who came into the nurse's office during Plaintiff's shift for a work injury. (*Id.* ¶ 17). While she had her back turned to the employee to get a cup for a urine sample, the employee stood

up and placed his genitals against Plaintiff's backside, placed his hand on Plaintiff's backside/hip area, and wrapped his other hand around Plaintiff's waist. (*Id.*). The employee "then moved his hand from Plaintiff's waist to between her breasts, kissed Plaintiff's neck and whispered, 'Can you help me with this test?'" (*Id.*).

Plaintiff alleges that "[f]ollowing the May 8, 2023 incident in the nurse's office, Koch Foods continued to fail to implement safety measures to protect nurses, especially the night shift nurses who were often alone in the office during their shifts." (*Id.* ¶ 18). After Plaintiff reported the sexual assault to her supervisor, Tasha Hanners ("Hanners"), HR Supervisor Donna Gardner ("Gardner"), Safety Manager Peggy Golden ("Golden"), and HR Manager Randy Cisne ("Cisne"), Plaintiff was no longer allowed to be in the nurse's office unsupervised, although other employees were allowed to be in their offices unsupervised. (*Id.* ¶ 19).

Plaintiff also alleges that "[o]n May 15, 2023, [she] was required to sign a 'final warning' disciplinary action for the sexual assault that occurred on May 8, 2023." (*Id.* ¶ 20). This document required her agreement not to be alone in the nurse's office. (*Id.*). According to Plaintiff, for the remainder of her employment with Koch Foods, she was the only nurse disciplined for not having supervision in the nurse's office (again, she says this was due to the sexual assault) and she was the only nurse that Koch Foods enforced the supervision policy against (due to her reporting the sexual assault). (*Id.*). Plaintiff had not received any prior warnings or write-ups related to the sexual assault incident. (*Id.*). Plaintiff alleges that the males in her department (who were safety techs) were not required to sign anything regarding being supervised in their office; rather, the only employees required to sign documentation regarding supervision in their offices were female employees. (*Id.*). Plaintiff further alleges that male employees were allowed to be alone in their offices. (*Id.*).

After the policy requiring Plaintiff to be supervised in her office was implemented, Plaintiff made numerous complaints that the new policy was a violation of HIPAA laws. (*Id.* ¶ 21). According to Plaintiff, the policy was constantly changing regarding who Plaintiff could and could not use to supervise her interactions with patients. (*Id.*). Plaintiff alleges that "[a]t one point, [she] was told to continue doing what she was already doing until [HR] and the Safety Department could reach an agreement on how to implement the policy." (*Id.*). Plaintiff further alleges that in her attempts to follow the policy, she realized that many employees would refuse to discuss their medical needs and complaints when a supervisor was present and would also refuse to officially report work-related injuries. (*Id.* ¶ 22). According to Plaintiff, "[e]mployees would . . . walk out, forfeiting their job, because they did not want a second person supervising a urine drug screen." (*Id.*).

Plaintiff's Amended Complaint alleges that Plaintiff was initially told to get "Rodney" or Jeff Hawkins to sit in the nursing office and supervise Plaintiff. (*Id.* ¶ 23). However, "they would often refuse to because of major breakdowns in the plant requiring their attention to prevent company losses[,]" and they would also complain that they should not be required to "babysit" Plaintiff. (*Id.*). Because of this, Plaintiff was told to have "Carolyn" sit in the nurse's office with her, but Carolyn would state that she was "too old to babysit Plaintiff and that Plaintiff should do her job, fix the employees, and send them on." (*Id.*). According to Plaintiff, when she made Hanners aware of these issues, Hanners told her to use Crystal, who was an hourly HR employee, as a supervisor. (*Id.*).

After the policy was implemented requiring that Plaintiff be supervised, "Plaintiff began to ask questions about who was and was not covered under HIPAA laws to make sure that she was not violating HIPAA by having someone else present in the examination room with her." (*Id.* ¶

24). Plaintiff was informed that only the nurses and HR employees were covered by HIPAA, but Plaintiff alleges that Golden did not want Plaintiff to use HR employees and instead required Plaintiff to use a safety tech. (*Id.*).

On September 5, 2023, Plaintiff complained about her work hours being changed again. (*Id.* ¶ 25). She claims these changes occurred multiple times after Hanners became her supervisor. (*Id.*). Plaintiff reported these complaints to Golden but was told that Golden did not listen to hourly employees and that instead she would discuss these complaints with Plaintiff's supervisor and then get back to Plaintiff. (*Id.*). Plaintiff alleges that "Golden finished [their] conversation by telling Plaintiff that 'holidays suck for everyone' and that Plaintiff should not use her son's suicide as a crutch." (*Id.*). According to Plaintiff, Golden never got back to her. (*Id.*).

Plaintiff also reported other concerns: her supervisors had added more work to her job duties; she no longer received call-in pay; and she was expected to come in for mandatory fifteen-minute meetings on her scheduled days off. (*Id.*). Plaintiff also "had been required to perform the duties of the night safety employee in addition to [Plaintiff's] own job duties because Koch Foods moved him [the night safety employee] to [d]ay shift to make the job easier on the day shift nurses." (*Id.*). Plaintiff alleges that after she started reporting concerns about company policies and procedures, Koch Foods required her to do walk-throughs despite this not being part of her job duties. (*Id.*). Plaintiff further alleges that "[a]nother nurse was not required to do walk-throughs because they could mess up her hair and she was too busy performing her own job duties[,]" which were the same job duties Plaintiff was also expected to perform. (*Id.*).

On February 2, 2024, Plaintiff complained about the fact that HR, again, wanted to hire an employee who was supposed to be on the no hire list. (*Id.* ¶ 26). She also expressed her concerns that the no hire list either did not exist or was not being checked before hiring incumbents. (*Id.*).

On May 5, 2024, a Koch Foods employee reported experiencing a back injury. (*Id.* ¶ 27). On May 7, 2024, Plaintiff reported that the injured employee was favoring his right leg, and Plaintiff informed the employee that protocol was to wait three to five days to allow a muscle strain to heal. (*Id.*). On May 8, 2024, the injured employee returned to the nurse's office crying and with severe pain. (*Id.*). Plaintiff "sent the employee home as 'extra help' and told his wife, at the instruction of Plaintiff's supervisors, not to take the employee to the emergency room." (*Id.*). Plaintiff alleges that she was instructed by Jeff Hawkins, a night shift manager, to send the employee home as extra help "to avoid OSHA recordables." (*Id.*). That same day, Plaintiff received an email from her supervisors questioning why the injured employee clocked out after only ten minutes on the clock and why Plaintiff was seen walking the injured employee to his car. (*Id.*). Plaintiff responded to the email stating that "the employee could not work and that instructions given to her were to discuss with 'Hawk' and to do her best." (*Id.*). Plaintiff also stated in her response that she walked the employee to his car because he was not capable of getting into the car on his own. (*Id.*).

On "May 9, 2023,"[1] Plaintiff sent an email to her supervisor requesting information about worker's compensation benefits related to mental health issues caused by one's working environment. (*Id.* ¶ 28).

On May 10, 2024, after learning of an accusation that she was alone in the nurse's office, Plaintiff sent an email to her supervisor stating that "she went back to check, and James Wilson was in the office with her for the entire time." (*Id.* ¶ 29). Plaintiff requested that her supervisor look back at the tapes because there was someone in the office with her. (*Id.*).

---

[1] Although Plaintiff states in her Amended Complaint that she sent the email to her supervisor concerning worker's compensation benefits on May 9, 2023, based on context and where this allegation falls in the complaint, the court construes the date to actually be May 9, 2024.

On May 14, 2024, Plaintiff emailed Gardner and stated that an employee had come into the nurse's office with a work excuse. (*Id.* ¶ 30). "Before the employee came in, Plaintiff was told by 'Tamisha,' the night shift shipping supervisor, to keep her eyes open." (*Id.*). When the employee with the work excuse came into her office, Plaintiff could smell marijuana on him, so she informed the employee that he needed to go home if he had smoked marijuana. (*Id.*). The employee became upset and said that he was just turning in an excuse. (*Id.*). Plaintiff let the employee know that he would be reported if he tried to go back on the job while high. (*Id.*). Plaintiff called Tamisha three times but was unable to reach her. (*Id.*). So, she went and found Tamisha in the HR office and "informed her that if she was doing reasonable suspicion for the employee, Tamisha needed to bring Plaintiff the paperwork." (*Id.*).

Plaintiff's Amended Complaint alleges that throughout her employment with Koch Foods, Plaintiff was continuously sexually harassed. (*Id.* ¶ 31). According to Plaintiff, Jonathan Maddox, a day shift manager who was at the plant during the night shift, made a comment that Plaintiff looked good because she had lost weight. (*Id.*). Plaintiff thanked him and made a joke that with Christmas coming up she would have to find a second job. (*Id.*). Maddox "then patted Plaintiff's pelvic region and said 'there are other things you could sell instead of getting another job.'" (*Id.*). Plaintiff also alleges that another employee, James Wilson, came into her office multiple times and would make comments about Plaintiff's butt shaking. (*Id.*). Crystal, an HR employee, was present for these encounters. (*Id.*). However, Plaintiff alleges that when she would ask Crystal if she heard these comments, Crystal would cover her ears and respond, "la la la I don't want to do a report on him." (*Id.*). Another HR employee, Ricky Young, also overheard the harassment. (*Id.*). According to Plaintiff, Young would laugh and ask her why she was leaving and comment that Plaintiff's face was turning red. (*Id.*). Plaintiff alleges that Wilson made "numerous unwelcome

advances towards [her], including pulling [her] chair closer to him, asking if he can 'have it' and trying to kiss [her]." (*Id.*).

On May 14, 2024, Plaintiff sent an email to Gardner requesting a meeting to speak with Gardner and Cisne. (*Id.* ¶ 32). Plaintiff reported her concern that she was suspended a few days after she sent an email to her supervisor questioning things in the department. (*Id.*).

On May 15, 2024, Plaintiff sent another email to Gardner "requesting a meeting before the determination of the status of her employment." (*Id.* ¶ 33). Plaintiff alleges that she "reported that after requesting information about worker's compensation for mental health, her email was forwarded to Tracy." (*Id.*). Plaintiff says that "Tracy informed Plaintiff that her personal doctor would have to take her off work." (*Id.*).

Plaintiff also reported that "Peggy and Tasha were making her job impossible," she was not being paid in a manner consistent with the agreement when she was hired, and she reported "concerns that she was retaliated against after questioning whether it was HIPAA compliant to have a supervisor, safety tech, human resources, or other employees in the nursing office with the nurses to hear their employees' medical information." (*Id.*). Additionally, Plaintiff reported "concerns that she was retaliated against because the employee with the back injury could not work" and "concerns that employees continue to be hired when they are supposed to be on the no hire list." (*Id.*). Plaintiff stated that she "tried to follow the chain of command in reporting her concerns regarding safety and that it failed her." (*Id.*). On the night of May 15, 2024, Plaintiff received an email questioning her sick time. (*Id.*).

On May 20, 2024, "Plaintiff's employment with Koch Foods was terminated with one of the following contributing factors being that supervisors had determined after looking at security footage that Plaintiff was alone in the [nurse's] office without supervision, a rule that was

implemented to penalize Plaintiff for reporting a sexual assault." (*Id.* ¶ 34). According to Plaintiff, she was not alone in the nurse's office and Koch Foods refused to allow her to prove that she had a supervisor present on the occasion in question. (*Id.*). Specifically, Plaintiff claims that Josh Smith and James Wilson were present in the nurse's office at that time. (*Id.*).

Another contributing factor for her termination was that she failed to follow instructions regarding the employee who was sent home with the back injury. (*Id.* ¶ 35). However, Plaintiff claims that she followed the instructions of Jeff Hawkins, the supervisor on duty, to send the employee home to "avoid OSHA recordables." (*Id.*). Her termination letter also stated that she had counseled the employee at the smoking area rather than in the nurse's office. (*Id.*). But Plaintiff claims that she "merely assisted the employee with getting outside due to his inability to get there on his own and allowed him to lie on the bench in the smoking area after providing care to him in the [nurse's] office." (*Id.*).

A third contributing factor for Plaintiff's termination was that she failed to follow the company shoe policy. (*Id.* ¶ 36). But Plaintiff claims that "at the same time" she was being disciplined for not following the company shoe policy, she was also "being reprimanded for not sending an injured employee into the plant to work with house shoes on." (*Id.*). Plaintiff also alleges that Hanners was allowed to report to work wearing flip flops and she was not terminated from her employment. (*Id.*)

A fourth contributing factor for Plaintiff's termination was that "Plaintiff had a disrespectful conversation with the employee" who she thought smelled like marijuana when he brought her a work excuse. (*Id.* ¶ 37). However, Plaintiff claims that she had "been warned by a supervisor, Tamisha, to keep her eyes open when looking at the excuse without any further explanation." (*Id.*). Subsequently, Plaintiff claims that she "performed her due diligence in making

sure the excuse was legitimate and in making sure the employee was aware that he could not work if he had been using marijuana." (*Id.*).

Plaintiff received her official termination letter on May 21, 2024. (*Id.* ¶ 38). Plaintiff alleges that she was not made aware of the factors listed in her termination letter "until after she sent the May 9, 202[4]² email requesting assistance with worker's compensation for mental health issues caused by [Koch Foods's] treatment of her since the sexual assault." (*Id.*).

On August 21, 2024, Plaintiff filed a complaint for sex discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). (Doc. # 22 at 3-4). On September 5, 2024, the EEOC issued Plaintiff a notice of her right to sue regarding the charges she brought to the agency's attention. (*Id.* at 5).

Plaintiff filed her initial Complaint in federal court on November 1, 2024. (Doc. # 1). On January 6, 2025, Koch Foods filed a Motion to Dismiss the initial Complaint. (Doc. # 11). On February 27, 2025, the court issued a Memorandum Opinion and Order granting in part Koch Foods's Motion to Dismiss and ordering Plaintiff to file an amended complaint to remedy certain deficiencies in her claims. (Docs. # 27, 28). On March 20, 2025, Plaintiff filed her Amended Complaint (Doc. # 29) and thereafter Koch Foods filed another Motion to Dismiss. (Doc. # 31).

## II.    Standard of Review

The Federal Rules of Civil Procedure require that a complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, the complaint must include enough facts "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Pleadings that contain nothing more

---

² As noted earlier, although Plaintiff states in her Amended Complaint that she sent the email to her supervisor concerning worker's compensation benefits on May 9, 2023, based on context and where this allegation falls in the complaint, the court construes the date to actually be May 9, 2024.

than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards, nor do pleadings suffice that are based merely upon "labels and conclusions" or "naked assertion[s]" without supporting factual allegations. *Id*. at 555, 557. In deciding a Rule 12(b)(6) motion to dismiss, courts view the allegations in the complaint in the light most favorable to the non-moving party. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007).

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although "[t]he plausibility standard is not akin to a 'probability requirement,'" the "complaint must demonstrate 'more than a sheer possibility that a defendant has acted unlawfully.'" *Id*. A plausible claim for relief requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claim. *Twombly*, 550 U.S. at 556.

In considering a motion to dismiss, a court should "1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Kivisto v. Miller, Canfield, Paddock & Stone, PLC*, 413 F. App'x 136, 138 (11th Cir. 2011) (quoting *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010)). That task is context specific and, to survive the motion, the allegations must permit the court based on its "judicial experience and common sense . . . to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. If the court determines that all the well-pleaded facts, accepted as true, do not state a claim that is plausible, the claims are due to be dismissed. *Twombly*, 550 U.S. at 570.

### III.    Analysis

In her Amended Complaint, Plaintiff asserts the following claims against Koch Foods: sex discrimination (Count One); sexual harassment – hostile work environment (Count Two); negligence (Count Three); negligent hiring (Count Four); negligent retention (Count Five); negligent training (Count Six); and negligent supervision (Count Seven). (Doc. # 29).

Below, the court addresses each of Plaintiff's claims.

### A.    Shotgun Pleading

Before addressing the merits of Plaintiff's Amended Complaint, the court must analyze whether the Amended Complaint is a shotgun pleading.

Shotgun pleadings violate Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), by "failing to one degree or another . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1294-95 (11th Cir. 2018) (quoting *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015)).

There are four basic categories of shotgun pleadings: (1) those in which "each count adopts the allegations of all preceding counts;" (2) those that do not re-allege all preceding counts but are "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action;" (3) those that do not separate each cause of action or claim for relief into a different count; and (4) those that assert multiple claims against multiple defendants without specifying which applies to which. *Weiland*, 792 F.3d at 1321-23. The key question in determining whether a pleading is deemed "shotgun" is not whether a complaint fits into an identified category, but rather whether it includes enough information to allow a defendant and the court to "readily

determine" if it states a plausible claim for relief. *See id.* at 1326.

The typical shotgun complaint contains several counts, "each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts (i.e., all but the first) contain irrelevant factual allegations and legal conclusions." *Strategic Income Funds, LLC v. Spear, Leeds, & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir. 2002). Here, Plaintiff's Amended Complaint contains seven causes of action. (Doc. # 29). In each count, Plaintiff "realleges the foregoing paragraphs as though fully set forth herein." (*Id.* ¶¶ 40, 48, 55, 61, 64, 67, 70). Therefore, Counts Two, Three, Four, Five, Six, and Seven incorporate not only every previous factual allegation but also the paragraphs defining the cause of action in each count before it.

The problem with such a pleading is that it leaves both the court and Koch Foods to guess what conduct the various counts are referencing because the pleading alludes to "everything that the plaintiff has previously mentioned anywhere in the complaint." *United States ex rel. Wallace v. Exactech, Inc.*, 2020 WL 4500493, at *8 (N.D. Ala. Aug. 5, 2020) (quoting *Est. of Bass v. Regions Bank, Inc.*, 947 F.3d 1352, 1356 n.5 (11th Cir. 2020)). The court notes that incorporating previous counts and large sections of a pleading into subsequent counts, by itself, does not necessarily render a pleading "shotgun." *Weiland*, 792 F.3d at 1324. But, incorporating large swaths of allegations *and* "rolling" counts into other counts "down the line" can do just that. *Id.* Therefore, Plaintiff's failure to precisely identify the facts relevant to each count and rolling those allegations from one count to another makes her Amended Complaint a shotgun pleading.

The Eleventh Circuit has shown "little tolerance for shotgun pleadings." *Shabanets*, 878 F.3d at 1295. "A district court has the 'inherent authority to control its docket and ensure the prompt resolutions of lawsuits,' which includes the ability to dismiss a complaint on shotgun

pleading grounds." *Id.*; *see also Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1357 (11th Cir. 2018). But, typically, the pleading party should have at least once chance to remedy such deficiencies before a court dismisses with prejudice an action on shotgun pleading grounds. *Shabanets*, 878 F.3d at 1295; *Jackson*, 898 F.3d at 1358. However, in Plaintiff's case, the court has already given her the opportunity to remedy the deficiencies in her initial Complaint, which she has not done. Therefore, Plaintiff's Amended Complaint is due to be dismissed because it is a shotgun pleading. Moreover, even if Plaintiff's Amended Complaint was not a shotgun pleading, it would still be due to be dismissed based on the merits, as the court explains below.

### B.    Title VII Claims (Counts One and Two)

#### 1.    Timeliness of Plaintiff's Claims

Because Plaintiff's Amended Complaint (much like her initial Complaint) is replete with various allegations spanning from 2018 to 2024, the court must assess the timeliness of Plaintiff's Title VII claims. "As a prerequisite to bringing suit under Title VII, a charge must be filed with the EEOC within 180 days of the date of the act giving rise to the charge." *Calloway v. Partners Nat. Health Plans*, 986 F.2d 446, 448 (11th Cir. 1993) (citing 42 U.S.C. § 2000(e)-5(e)). Plaintiff filed her EEOC charge on August 21, 2024. (Doc. # 22 at 3-4). Therefore, as a general rule, the events in Plaintiff's Amended Complaint that occurred before February 23, 2024 are untimely.

#### 2.    Sex Discrimination (Count One)

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). To establish a prima facie case for sex discrimination under Title VII, Plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated

employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job. *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220-21 (11th Cir. 2019). While Plaintiff is not required to plead every fact of a prima facie case, she must at a minimum assert facts demonstrating an intent to discriminate. *See Jackson v. Bellsouth Telecomms.*, 372 F.3d 1250, 1270-71 (11th Cir. 2004); *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 974 (11th Cir. 2008); *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1246 (11th Cir. 2015); *Boyd v. Medtronic, PLC*, 2018 WL 1964572, at *4 (N.D. Ala. Apr. 26, 2018).

In its Motion to Dismiss, Koch Foods argues that Plaintiff "fails to allege she suffered an adverse employment action based on her sex." (Doc. # 31 at 7). Koch Foods made this argument in its first Motion to Dismiss (Doc. # 11 at 3), and the court agreed, holding in its Memorandum Opinion that "[w]hile Plaintiff's Complaint contains a myriad of allegations related to her employment with Koch Foods, none of these allegations can be read to suggest that Plaintiff suffered an adverse employment action because she is a female." (Doc. # 27 at 11). Despite this holding, the court allowed Plaintiff the opportunity to amend her Complaint. (*Id.* at 19). Plaintiff has now filed that amendment, but again she has failed to sufficiently state a claim of sex discrimination.

Similar to her initial Complaint, Plaintiff's Amended Complaint contains a plethora of allegations. (*See generally* Doc. # 29). However, none of these allegations adequately support a finding that Plaintiff suffered an adverse employment action because she is a female. For instance, Plaintiff alleges that Koch Foods "implemented policies and procedures requiring supervision" and that these policies and procedures "were applied only to females in [Plaintiff's] department and were not applied to male safety technicians." (*Id.* ¶ 44). Plaintiff further alleges that "[t]he only employees in Plaintiff's department who were male, the safety techs, were not required to

sign anything regarding being supervised in their office." (*Id.* ¶ 20). These allegations appear to allege that the male safety technicians are comparators; however, Plaintiff's own allegations indicate that these individuals are not proper comparators.

Under Title VII, a comparator is only proper when he or she is "similarly situated in all material respects." *Lewis*, 918 F.3d at 1219. A comparator is considered "similarly situated" when the comparator (1) engaged in the same basic conduct or misconduct as the plaintiff; (2) was subject to the same policy, guideline, or rule as the plaintiff; (3) had the same supervisor as the plaintiff; and (4) will share the plaintiff's employment or disciplinary history. *Id.* at 1227-28. Although "[d]etermining whether a plaintiff and comparator are 'similarly situated in all material respects' is a fact-intensive inquiry better suited to summary judgment" *Alvarez v. Lakeland Area Mass Transit Dist.*, 406 F. Supp. 3d 1348, 1354 (M.D. Fla. 2019) (quoting *Lewis*, 918 F.3d at 1218), it is clear on the face of Plaintiff's Amended Complaint that the male safety technicians Plaintiff names as comparators are not similarly situated to her. First, the male safety technicians do not share Plaintiff's employment circumstances because they are not nurses. Second, Plaintiff has not alleged that they engaged in the same basic conduct as she did. Nowhere in her Amended Complaint does Plaintiff allege that a male safety technician was sexually assaulted and reported the sexual assault (as Plaintiff did) and as a result, was subject to a supervision policy as Plaintiff was.

In her response to Koch Foods's Motion to Dismiss, Plaintiff asserts that "the safety technicians should have been subject to the same employment policy and not been allowed to be unsupervised in their offices to prevent further reports of sexual assault. The policy not being applied to them is the issue in this case." (Doc. # 34 at 4). Beyond her bald assertion, Plaintiff provides no explanation as to why the male safety technicians should have been subject to the

same employment policy. Furthermore, although Plaintiff claims that the safety technicians were in her department and answered to the same HR managers as Plaintiff, this does not elevate them to the status of proper comparators. They are clearly not similarly situated as they are not nurses like Plaintiff nor did Plaintiff allege that any of them reported a sexual assault as Plaintiff did.

Furthermore, even if the male safety technicians were proper comparators, Plaintiff's sex discrimination claim based on Koch Foods's supervision policy is untimely. She alleges that on May 15, 2023, she was "required to sign a 'final warning' disciplinary action . . . [that] required her agreement not to be alone in the [nurse's] office." (Doc. # 29 ¶ 20). This was over a year before she filed her EEOC charge, well outside the 180-day time frame. (*See* Doc. # 22 at 3-4 (Plaintiff's EEOC charge was filed on August 21, 2024)). For all of these reasons, Plaintiff has not sufficiently asserted facts demonstrating an intent to discriminate based on her allegations involving the male safety technicians.

Plaintiff also makes the following allegations to support her claim of sex discrimination: (1) other nurses in her department (all of whom were female)[3] were not required to take lunch breaks; (2) she was not paid in full for her call-ins; (3) "other employees were allowed to be unsupervised in their offices"; (4) she was the "only nurse disciplined for not having supervision in the nurse['s] office"; (5) she was required to sign a "final warning" disciplinary action in response to her report of the sexual assault; (6) her work hours were routinely changed; and (7) she was terminated for being alone in the nurse's office. (Doc. # 29 ¶¶ 13, 16, 19, 20, 25, 34). None of these allegations sufficiently establish that Plaintiff was treated differently because she is a woman. In other words (just as the court explained in its previous Memorandum Opinion), Plaintiff's allegations do not suggest that males who were similarly situated (1) were not required

---

[3] Plaintiff admits that all of the males in her department were safety technicians, not nurses. (Doc. # 34 at 4).

to take lunch breaks; (2) were paid in full for call-ins; (3) were allowed to be unsupervised in their offices; (4) were not disciplined for not having supervision in the nurse's office; (5) were not required to sign a "final warning" disciplinary action after reporting a sexual assault; (6) did not have their work hours routinely changed; and (7) were not terminated for being alone in the nurse's office. Therefore, these allegations do not "assert facts demonstrating an intent to discriminate." *Edge*, 2024 WL 1321072, at *2.

Moreover, excluding her termination on May 20, 2024, all of these additional allegations are untimely as they occurred long before Plaintiff filed her EEOC charge on August 21, 2024. (Doc. # 22 at 3-4); (*see* Doc. # 29 ¶ 13 (Plaintiff alleging that other nurses were not required to take lunch breaks in December 2021), ¶¶ 16, 19, 20 (Plaintiff alleging she was not paid in full for call-ins; other nurses were allowed to be unsupervised in their offices; she was the only nurse disciplined for being unsupervised in her office; and she was required to sign a "final warning" disciplinary action in response to her report of the sexual assault in May 2023), ¶ 25 (Plaintiff alleging that her work hours were changed routinely in September 2023)). These dates are all outside the 180-day period before she filed her EEOC charge on August 21, 2024. (Doc. # 22 at 3-4).

Plaintiff also complains about treatment by her supervisor, Hanners, and "Peggy," two women, who "were making her job impossible." (Doc. # 29 ¶ 33). This allegation, without more, simply does not support an inference that Plaintiff was discriminated based on her gender.

Furthermore, just as in her initial Complaint in Count One, Plaintiff appears to assert a Title VII retaliation claim. She claims that Koch Foods discriminated against her by "retaliating against her for reporting a sexual assault, and firing her." (*Id.* ¶ 43). The court addressed this retaliation claim in its previous Memorandum Opinion, advising Plaintiff that the claim failed as pleaded and

"to the extent that Plaintiff has asserted a retaliation claim under this count, it is a shotgun pleading because as a separate legal claim, her retaliation claim must be listed under a separate heading." (Doc. # 27 at 12-13). Despite the court's advice and its clear articulation of what a Title VII retaliation claim requires a plaintiff to show (*see id.* at 12), Plaintiff has again failed to sufficiently plead a retaliation claim. First, the court is unclear whether Plaintiff alleges that the material adverse employment action she suffered was Koch Foods's implementation of the supervision policy or her termination. Second, regardless of which is the material adverse employment action she suffered, she also has not sufficiently alleged a causal relation between her reporting the sexual assault and Koch Foods's subsequent actions. Moreover, she has failed to include the retaliation claim under a separate heading, thus it remains a shotgun pleading. *See Weiland*, 792 F.3d at 1322-23. Therefore, to the extent that Plaintiff asserts a claim of retaliation, this claim is due to be dismissed.

In conclusion, while Plaintiff asserts that she "experienced repeated, pervasive, and severe sex discrimination from the time of her reported sexual assault until her involuntary discharge," and Koch Foods's "actions toward Plaintiff were taken because she was a woman, and constitute a willful and w[a]nton disregard of Plaintiff's rights under Title VII" (Doc. # 29 ¶¶ 45-46), these allegations are wholly conclusory and are not supported by any plausible facts alleged in the Amended Complaint that show Koch Foods's intent to discriminate against Plaintiff based on her gender. Therefore, for all these reasons, Plaintiff's sex discrimination claim is due to be dismissed.

### 3.     Sexual Harassment – Hostile Work Environment (Count Two)

To establish a Title VII prima facie case of a hostile work environment based on sexual harassment, Plaintiff must demonstrate the following elements:

(1) she belongs to a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or

pervasive to alter the terms and conditions of the employment; and (5) there is a basis for holding the employer liable for the harassment.

*Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1304 (11th Cir. 2016) (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)). Koch Foods argues that Plaintiff has not alleged facts to plausibly infer that the complained of conduct was sufficiently severe and pervasive. (Doc. # 31 at 13).

"Either severity *or* pervasiveness is sufficient to establish a violation of Title VII." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (emphasis in original). In evaluating whether harassment is severe or pervasive, courts look to the totality of the circumstances, including factors such as (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with an employee's job performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

Plaintiff's Amended Complaint includes allegations of a sexual assault on May 8, 2023 (Doc. # 29 ¶ 17) and instances of sexual harassment by two employees: Maddox and Wilson. (*Id.* ¶ 31). However, as the court understands it, Plaintiff's sexual harassment claim is not premised on these incidents; rather, her claim is based on Koch Foods's policies that "were enforced against Plaintiff in response to her report of sexual harassment." (*Id.* ¶ 51).

The court addressed this claim in its previous Memorandum Opinion and held that Plaintiff's allegations were wholly conclusory and did not show how the alleged sexual harassment was either severe or pervasive. (Doc. # 27 at 14). Plaintiff's Amended Complaint contains the exact same allegations. She alleges that Koch Foods "participated in the harassment of Plaintiff by its harassing, discriminatory, and retaliatory behavior toward Plaintiff as alleged herein and/or substantially assisted, encouraged, and condoned the continued harassment toward Plaintiff by

creating a hostile work environment and retaliating against Plaintiff for reporting a sexual assault." (*Compare* Doc. # 29 ¶ 50 *with* Doc. # 14 ¶ 39). Plaintiff further alleges that Koch Foods "subjected Plaintiff to severe and/or pervasive harassment of a sexual manner that a reasonable woman in Plaintiff's position would have found the environment to be hostile and abusive. (*Compare* Doc. # 29 ¶ 51 *with* Doc. # 14 ¶ 40). Again, these allegations are conclusory and do now show how the alleged sexual harassment (Koch Foods's implementation of its supervision policy) was either severe or pervasive.

However, Plaintiff has added to her Amended Complaint the allegation that she "was subjected to a hostile work environment related to harassment based on sex as described in paragraphs 17-25, 31, 34, and 38." (Doc. # 29 ¶ 52). Generally, paragraphs seventeen through twenty-five detail the May 8, 2023 sexual assault (*id.* ¶ 17) and the alleged actions taken after that incident, such as the following: Koch Foods's failure to "implement safety measures to protect nurses" following the sexual assault (*id.* ¶ 18); Koch Foods's implementation of the policy requiring supervision in the nurse's office (*id.* ¶¶ 19-20); Plaintiff's complaints about the new policy violating HIPAA (*id.* ¶ 21-22, 24); the difficulties Plaintiff had in finding someone to supervise her in the nurse's office (*id.* ¶ 23); and Plaintiff's concerns about her work hours being changed, the addition of more job duties, and not receiving call-in pay. (*Id.* ¶ 25). Paragraph thirty-one alleges the sexual harassment Plaintiff faced from Maddox and Wilson (*see id.* ¶ 31), paragraph thirty-four alleges that Plaintiff was terminated for being alone in the nurse's office without supervision (*id.* ¶ 34), and paragraph thirty-eight alleges when Plaintiff received her official termination letter. (*Id.* ¶ 38).

Many of these actions – such as Koch Foods's implementation of the supervision policy, Plaintiff's complaints about the new policy violating HIPAA, Plaintiff's concerns about finding

supervision, and her concerns about work hours and pay – are not so severe or pervasive to amount

to a hostile work environment. After all, as the Supreme Court has taught us, Title VII does not set

forth "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs.,*

*Inc.*, 523 U.S. 75, 80 (1998). However, the court could conclude that the sexual assault that

occurred on May 8, 2023, and the undated sexual harassment by Maddox and Wilson could be

severe or pervasive, creating "an environment that a reasonable person would find hostile or

abusive." *Harris*, 510 U.S. at 17 (1993). But, because Plaintiff's Amended Complaint is a shotgun

pleading, the court cannot determine whether Plaintiff has sufficiently pled a timely sexual

harassment claim based on these allegations. Moreover, the court is unclear whether Plaintiff's

sexual harassment claim is based on this alleged conduct, or if it is solely based on Koch Foods's

implementation of the supervision policy.

For the foregoing reasons, the court will give Plaintiff one final opportunity to plead this

claim in an amended complaint.

### C.    State Law Claims (Counts Three, Four, Five, Six, and Seven)

#### 1.    Negligence (Count Three)

A plaintiff bringing a negligence claim must allege four elements: (1) duty; (2) breach; (3)

causation; and (4) damages. *See, e.g., Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994) (citing

*Albert v. Hsu*, 602 So. 2d 895, 897 (Ala. 1992)). "The existence of a legal duty is a question of law

for the court; 'where there is no duty, there can be no negligence.'" *Albert*, 602 So. 2d at 897

(citing *Rose v. Miller & Co.*, 432 So. 2d 1237, 1238 (Ala. 1983)). In her Amended Complaint,

Plaintiff alleges that:

> Negligence in the instant matter is sexually harassing, providing an unsafe work
> environment despite reported concerns from employees, condoning harassment,
> failing to maintain proper documentation on employees who should not be rehired
> for safety reasons, condoning retaliation against protected employees for protected

actions which a reasonably prudent employer would not do under like circumstances or failing to do something that a reasonably prudent employer would do under like circumstances.

(Doc. # 29 ¶ 57). Specifically, Plaintiff alleges that Koch Foods breached its duty of care to her in

the following ways:

> a. Failing to use and apply employment policies to protect employees from retaliation for protection actions, such as reporting sexual harassment as described in paragraphs 17-25, 31, 34, and 38;
> b. Failing to take adequate corrective action or preventive action as described in paragraphs 8-9, 11-12, 14-15, 17-18, 20-21, 23, 25-26, and 30-31;
> c. Failing to provide a safe working environment for employees as described in paragraphs 8-12, 14-15, 17-18, 20-21, 23, 25-26, 28, and 30-31;
> d. Failing to maintain records and documentation to prevent the rehiring of prior employees who created an unsafe working environment as described in paragraphs 10, 11, and 20;
> e. Failing to implement policies and procedures that effectively allow employees to report concerns and receive a timely response as described in paragraphs 8-14, 16-17, 19-21, and 23-31; and
> f. Other acts of negligence to be determined through discovery.

(*Id.* ¶ 59).

Plaintiff made these exact same allegations in her initial Complaint. Indeed, the only

difference is the addition of the reference to the paragraphs in the Amended Complaint. (*Compare*

*id. with* Doc. # 1 ¶ 50). Certainly, this is an interesting pleading tactic considering how the court

previously advised Plaintiff on her negligence claim. In its Memorandum Opinion addressing

Koch Foods's first Motion to Dismiss, the court concluded that Plaintiff's negligence allegations

that related to retaliation and sexual harassment in the workplace were subsumed by a Title VII

claim. (*See* Doc. # 27 at 16 (citing *James v. Montgomery Reg'l Airport Auth.*, 2016 WL 4414843,

at *2 (M.D. Ala. 2016), *report and recommendation adopted*, 2016 WL 4435687, at *1 (M.D. Ala.

Aug. 17, 2016) ("Congress passed Title VII precisely because existing common-law mechanisms

for preventing workplace discrimination were inadequate.")). The court also held that "an

allegation that an employer breached his statutory or common law duty to provide a safe workplace

when sexual harassment occurs fails to state a negligence claim." (*Id.* at 17 (citing *Speegle v. Loparex, Inc.*, 2007 WL 9711748, at *4 (N.D. Ala. Apr. 5, 2007)). Additionally, the court concluded that because Plaintiff had not sufficiently pled a claim for sexual harassment, she could not plead a claim against Koch Foods for failing to investigate such a claim. (*Id.*).

The addition of references to certain paragraphs in the Amended Complaint does not save Plaintiff's negligence claim because the negligence claim remains the same as it was previously pled. Because the court held then that Plaintiff failed to adequately plead a negligence claim, the court reaches the same conclusion today; thus, Plaintiff's negligence claim is due to be dismissed.

### 2.    Negligent Hiring, Retention, Training, and Supervision (Counts Four, Five, Six, and Seven)

Under Alabama law, in order for an employer to be liable for the negligent hiring, training, retention, and supervision of its employee, the plaintiff must also prove some underlying "wrongful conduct" on the part of an employee. *Brannon v. Etowah Cnty. Ct. Referral Program, LLC*, 325 F.R.D. 399, 426 (N.D. Ala. 2018). That is, "[i]n order to establish a claim against an employer for negligent supervision, training, and/or retention, the plaintiff must establish that the allegedly incompetent employee committed . . . [a] tort." *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002); *see also Smith v. Boyd Bros. Transp. Inc.*, 406 F. Supp. 2d 1238, 1248 (M.D. Ala. 2005) ("Under Alabama law, the finding of underlying tortious conduct is a precondition to invoking successfully liability for the negligent or wanton training and supervision of an employee.").

Plaintiff's claims in Counts Four, Five, Six, and Seven allege that Koch Foods negligently hired, retained, trained, and supervised "the supervisors, managers, human resources employees, and other Koch Foods employees who interacted with Plaintiff as described above in paragraphs 6-39." (Doc. # 29 ¶¶ 62, 65, 68, 71). The court previously advised Plaintiff that her initial

Complaint did not adequately plead a claim for negligent hiring, retention, training, or supervision because it did not specify which employee committed an alleged tort or the alleged tort committed. (*See* Doc. # 27 at 18). Despite this advice and the opportunity to amend her Complaint, Plaintiff's Amended Complaint suffers from the same problem. Although Plaintiff references specific paragraphs in her Amended Complaint – that is, thirty-four lengthy, factually dense paragraphs – it is not the court's job to parse through those paragraphs to determine which exact employees Plaintiff is referencing and what exact torts they committed. The court gave Plaintiff the opportunity to replead these claims and informed her as to why they were deficient in her initial Complaint. Yet, Plaintiff's allegations in her Amended Complaint are hardly any more specific than those in her initial Complaint. Accordingly, Counts Four, Five, Six, and Seven are due to be dismissed.

## IV.    Conclusion

For the reasons explained above, Koch Foods's Motion to Dismiss (Doc. # 31) is due to be granted in part. The Motion (Doc. # 31) is due to be granted as to Counts One, Three, Four, Five, Six, and Seven. On or before June 2, 2025, to the extent she wishes to pursue her claim in Count Two, Plaintiff shall file an amended complaint remedying the pleading deficiencies in that claim.

**DONE** and **ORDERED** this May 19, 2025.

**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE